GIPPS BREWING CORPORATION v. CENTRAL MANUFACTURERS' MUT. INS. CO. et al.

No. 8512.

Circuit Court of Appeals, Seventh Circuit.

Jan. 8, 1945.

Rehearing Denied Feb. 19, 1945.

EVANS, Circuit Judge, dissenting in part.

Hayes McKinney, George H. Grear, Hendrik Folonie, and C. Oscar Carlson, all of Chicago, Ill., and J. M. Elliott, of Peoria, Ill. (McKinney, Folonie & Grear, of Chicago, Ill., of counsel), for appellants.

Richard J. Kavanagh and J. Lewis Bond, both of Peoria, Ill. (Hunter, Kavanagh & McLaughlin, of Peoria, Ill., of counsel), for appellee.

Before EVANS, SPARKS and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This is an action by plaintiff to recover for fire loss upon a policy of insurance issued by the fifteen defendants. The case was tried before the court without a jury, and resulted in separate judgments against the defendants for their respective portions of the loss, in the aggregate amount of $76,092.79. From these judgments defendants appeal.

The complaint set out the policy in full; alleged plaintiff's ownership of the property covered; that a fire occurred July 17, 1941, causing loss or damage; compliance on plaintiff's part of all of the conditions of the policy required of it; defendants' refusal to pay; and alleged a loss of $94,061.18. The complaint further alleged that on December 11, 1941, defendants advised plaintiff that the policy was void, and that by reason thereof plaintiff was entitled to recover unearned premiums in the sum of $5,000, from that date to the expiration of the policy.

Defendants alleged in their answer that the policy was invalidated and became void by reason of concealment and misrepresentation by plaintiff of material facts and circumstances concerning plaintiff's property and the fire loss, and because of fraud and false swearing by plaintiff, in violation of the conditions of the policy; the refusal of plaintiff's officers and representatives to answer questions put to them concerning material facts and circumstances relating to plaintiff's property and to its claim, during the course of an examination under oath under the terms of the policy; that plaintiff after the fire failed to forthwith separate the damaged and undamaged personal property and put it in the best possible condition, or to furnish to defendants a complete inventory of the destroyed, damaged and undamaged property, or to exhibit after the fire all that remained of the property covered under the policy.

The insurance in blanket form covered buildings and contents thereof, constituting plaintiff's brewery plant in Peoria, Illinois, consisting of nine or more buildings designated as buildings Nos. 1 to 9, together with some smaller buildings. The amount of the insurance at the time of the fire was $298,000. The insurance was against the peril of fire and other perils. There was also an endorsement covering in the sum of $4,887.20, for a special premium, the amount of premium for the unexpired term earned by reason of payment for the loss. The policy contained a 90% coinsurance clause. The policy also contained numerous provisions, the breach of which is relied upon as a defense to plaintiff's cause of action. These provisions will be subsequently referred to in connection with the discussion in which they are involved.

The fire occurred, as alleged, July 17, 1941. It originated in building No. 9 and the loss was largely, although not entirely, confined to that building and its contents.

On July 22, 1941, plaintiff employed William A. Glancy, a public adjuster of long experience, for the purpose of adjusting and collecting its loss from the defendants. Glancy, with the assistance and under the direction of Vincent M. Quinn, plaintiff's president, and Harley J. Green, its treasurer, proceeded to prepare a statement which was submitted to defendants' adjusters on August 4, 1941. This statement was introduced in evidence as defendants' exhibit 15. The importance of this exhibit is fully recognized by all of the parties, as it is relied upon as the main support for the defense of fraud. In this connection, it is pertinent to note that on August 30, 1941, plaintiff submitted to defendants a proof of loss, signed and sworn to by plaintiff's president. This was introduced in evidence as plaintiff's exhibit 18.

Defendants' exhibit 15 consisted of five typewritten pages and one double sheet of figures in pencil on paper ruled in columnar form. The length of this exhibit precludes its reproduction here, and we find it difficult to describe it in a way which will fairly disclose the respective contentions which are made concerning

it. Defendants term it an inventory, or at least an attempted inventory, while plaintiff tenaciously insists that it is not an inventory and was never intended as such, although it is certain that if it be not so considered, then there was no pretense on the part of plaintiff in complying with the policy provision in this respect. To illustrate plaintiff's attitude toward this exhibit, we quote from its brief thus: "This statement was prepared and submitted, as they well know, only as a preliminary estimate to form a basis upon which to start negotiations for adjustment." It appears to be plaintiff's position that this exhibit must be carefully limited to a mere preliminary statement so as to escape responsibility for the representations contained therein. We are of the view that plaintiff's protestations in this respect are of little avail. Further, it is our view that in so far as the charge of fraud is concerned, it is immaterial what label be placed upon this exhibit. The question in any event is whether plaintiff made representations for the purpose and with the intent of defrauding the defendants.

Exhibit 15 contained plaintiff's name and location at the top of the first sheet, was furnished to defendants by plaintiff's authorized agents, and, notwithstanding the fact it was unsigned, we think plaintiff is bound by the information therein contained. The first page of the exhibit, under the title of "Summary," listed various buildings and items of merchandise, with the value of each, and also the amount of loss as to building No. 9 and as to each item of merchandise contained therein. The total value of the buildings and merchandise disclosed was $379,601.74, and the total amount of loss shown was $119,-790.79. The double sheet of figures contained numerous columns, and under a column headed "Claim" there was listed the damage to building No. 9, together with numerous items of merchandise contained therein, and also minor items of damage to other buildings and other merchandise. The total amount of the items shown under this "Claim" column was $119,790.79, which was the same amount shown under the "Loss" column appearing on page 1 of the exhibit. As we view the situation, this was a plain representation by plaintiff that it had sustained a loss in that amount. The loss as found by the court was $71,000, or nearly $49,000 less than that shown by exhibit 15. De-

fendants urge that such an excessive claim as to the amount of loss is a potent indication of the purpose and intent to defraud.

Defendants under the terms of the policy were entitled not only to an inventory of lost and damaged property but also of all the property covered by the insurance. This was important in order to give application to the 90% coinsurance clause. A certain number of cases of undamaged bottled beer had been salvaged during the course of the fire and immediately afterward, which plaintiff conceded at the trial as being 5,796 cases, with a value of almost $11,000. There was also $12,000 worth of machinery and equipment covered by the insurance, which were not damaged in the fire. While neither of these two items of almost $23,000 was claimed as a loss by plaintiff, they were omitted from exhibit 15. We are not advised as to the extent, if any, which the omission of these items would have affected plaintiff's claim against defendants, but conceivably their inclusion might have increased the portion of the loss to be borne by plaintiff.

The most glaring defect in this exhibit was the inclusion of 43,194 cases of bottles, of a value afterward stipulated at $29,-717.47, shown in the exhibit to have been lost, when as a matter of fact they were not in the building at the time of the fire and were not even covered by the insurance. In addition, the value of these cases was increased in the amount of $6,646.20, for the purpose of adjusting their book value to the market value. It was afterward shown that there had been no increase in value in this respect, and this item was waived by plaintiff. It will be noted that these two items amounting to over $36,000 make up a large portion of the difference between the loss claimed and that found by the court.

On August 30, 1941, a proof of loss signed and sworn to by plaintiff's president was furnished the defendants. (This is referred to as plaintiff's exhibit 18.) On this exhibit, aggregate values were stated at $366,118.34 (instead of the original $379,601.74), loss was stated as $87,477.17 (instead of the original $119,790.79), and under the application of the coinsurance clause there was claimed $78,870.05. (The amount of loss found by the court was $71,000.) As it subsequently developed, this exhibit contained some discrepancies which we think are of minor importance.

We think it can also be stated that the misrepresentations contained in exhibit 15 were to a large extent eliminated in exhibit 18.

Defendants rely not only upon exhibits 15 and 18 in support of their defense of fraud but also upon statements and conduct of plaintiff's officials, and especially its adjuster Glancy. On the other hand, plaintiff relies upon certain facts and circumstances which it claims dispel any idea of fraud. In our view of the situation, an analysis of this testimony would unduly prolong this opinion and in the end would serve no good purpose. However, we think it is not unfair to observe that the record leaves room for little, if any, doubt but that defendants were justified in believing that plaintiff was attempting to perpetrate a fraud. We find it difficult to reconcile some of the representations made by plaintiff, and especially those contained in exhibit 15, consistent with plaintiff's honesty and good faith. We note in this connection that plaintiff's adjuster Glancy, who prepared and submitted exhibit 15 and who was in a better position than anyone else to explain the discrepancies therein, was not called as a witness although the record discloses that he was present at the trial.

■ Whatever view we might have, however, concerning this question of fraud is rather immaterial for the reason that we are not the trier of the facts. That is solely the prerogative of the District Court. That court found that the plaintiff did not wilfully or intentionally defraud or attempt to defraud the defendants, or conceal or attempt to conceal or misrepresent any material facts to the defendants.

■ In this connection, we note that we have read the authorities relied upon by the respective parties as to what constitutes fraud in a matter of this character. We shall not attempt to discuss or analyze them for the reason that the rule is well established that misrepresentation or concealment of material facts by the insured must be wilful and with the intent to deceive and defraud the insurer. The burden, of course, is upon the insurer to establish such defense, and a reviewing court is bound by the finding of the trial court if the latter is founded upon any rational basis. We cannot say that the finding of the trial court in this respect is so clearly erroneous as to require a contrary holding. We therefore accept it.

## Non-Compliance by Plaintiff with Policy Provisions.

The policy contained the following provision: "No suit or action on this policy, for the recovery of any claim, shall be sustainable * * * unless all the requirements of this policy have been complied with."

The policy contained certain provisions to be complied with by plaintiff in case of a loss. Defendants rely upon plaintiff's non-compliance with a number of such provisions, which it is asserted resulted in a forfeiture of plaintiff's rights under the policy. The policy required: "The insured shall give immediate notice, in writing, to this Company, of any loss or damage, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, stating the quantity and cost of each article and the amount claimed thereon * * *. The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same * * *."

The findings of the District Court on the matter of compliance are rather confusing and leave us in doubt as to what was intended in this respect. The court found: "Plaintiff complied with all of the terms and conditions of the policy in suit prior to the institution of suit." It also found: "It was not physically possible, due to the condition of the property after the loss, to furnish to the defendants, or their representatives, a complete inventory of all destroyed, damaged and undamaged property." No finding was made as to waiver, but as a conclusion of law the court stated: "If any act or omission of the plaintiff could have been considered as the basis of the forfeiture of the policy, such forfeiture was waived by the subsequent conduct of the defendants." Under these circumstances, we are unable to tell whether the judgment rests upon compliance, impossibility of compliance (in the furnishing of a complete inventory), or defendants' waiver of non-compliance by the plaintiff.

We shall first consider the requirement for submission to examination under oath.

As to this provision, the court found compliance and that plaintiff's officers, etc., answered "all material questions asked them by defendants' attorneys." That plaintiff's president Quinn and its adjuster Glancy refused to answer questions upon the advice of counsel is not disputed. The only question open for consideration is whether such questions were material. The examination was attempted, pursuant to defendants' request, under the policy provision. The questions largely related to the original claim or statement of loss (Ex. 3 on examination—defendants' exhibit 15 on the trial), and plaintiff's proof of loss (Ex. 1 on examination—plaintiff's exhibit 18 on the trial). As has already been noted in this opinion, these two exhibits really go to the heart of this law suit. The record discloses that this examination continued over a period of two days and the transcript covered approximately 300 pages. Employees of plaintiff other than Quinn and Glancy were examined, and the record does not disclose what portion of the examination was devoted to them.

At the trial, defendants offered the entire transcript of 300 pages as defendants' exhibit 2. Counsel for plaintiff objected to its admission upon the grounds that it would clutter up the record when two or three pages would be sufficient to present the question. Thereupon, defendants offered twenty-six pages, which were admitted. Thus these are the only pages of the transcript which appear in the record.

Plaintiff's counsel at the examination objected to questions with reference to defendants' exhibit 15 on the grounds (1) that defendants' counsel referred to it as a claim or inventory; (2) that the questions were controversial in nature; (3) that the questions called for answers which were impeaching; and (4) that the questions did not seek information as to the extent of the loss.

That the questions were proper and material, we think there can be no doubt. We shall quote a few typical examples:

Witness, Quinn

"Q. And this (referring to exhibit 15) was a representation, was it not, to the insurer, through Mr. Peck, as their representative, as to the value of the various buildings and other property * * * and the losses?"

"Q. Well, now, look at the statements there, for example, the summary on the first page, as it appears there. * * * Did you consider those figures there correct at the time you handed this statement to Mr. Peck?"

Upon the ground that the exhibit referred to was merely a preliminary estimate of loss, plaintiff's counsel advised Quinn to refuse an answer.

"Q. What was the purpose of making up this statement, this Exhibit 3 (defendants' trial exhibit 15)?"

"Q. Was it intended to reflect the facts as to the total inventory of merchandise on the day of the fire?"

Answer to these questions was refused on objection of counsel that the exhibit was not a formal proof of claim.

"Q. Now, in this Exhibit 3, your original claim here, you have a claim of $33,651.26, total loss on account of cartons in Building No. 9. I show you this item right here. (Indicating.) In your proof of loss, Exhibit 1, that item of loss is $3,286.83. How do you account for that difference?"

Objected to on the ground that plaintiff did not recognize exhibit 3 as a claim. Witness refused to answer.

Similar questions were propounded to the witness Glancy and answers refused. Counsel for plaintiff then advised the witness that he need not answer questions concerning controversial matters, and also took the position that questions were improper the answers to which might be used for the purpose of impeachment. Then occurred the following colloquy:

"Mr. Grear: Am I to understand you that you are going to advise all of your witnesses that they need not answer any questions that I ask them concerning our Exhibit 3 for identification?

"Mr. Kavanagh: To bring the matter to a prompt conclusion, yes.

"Mr. Grear: Then, on behalf of the assured, you are now refusing to permit the examination or to give me any information in answer to my questions as to this Exhibit 3 for identification?

"Mr. Kavanagh: That is right."

Then follow some questions concerning negotiations which Glancy had conducted with the defendants.

"Q. Did you prepare any written statements and submit them to the representatives of the insurer in connection with your negotiations?"

"Q. Now, how many written statements did you prepare in connection with your negotiations for the settlement of this loss prior to the preparation of the proof of loss?"

Answers to these questions were refused on the ground that they were immaterial. Answers to the following questions were refused.

"Q. I don't know if I asked you if you did prepare this group of papers marked Exhibit 3 for identification."

"Q. Did you not present this Exhibit 3 to Mr. Peck at your first meeting with him?"

"Q. Isn't it true that you stated to Mr. Peck that the items appearing in Exhibit 3 were true and correct?"

 We think there is no escape from the conclusion that these witnesses purposely refused to answer questions which were material to the inquiry. We see no basis for refusal to answer upon the ground that they were controversial or that the answers thereto might have been used for the purpose of impeachment. Such a limitation would seriously impair and perhaps destroy defendants' right under this provision of the policy. Neither do we think there is any merit in plaintiff's suggestion that the examination was only properly directed at the amount of the loss. Certainly there is nothing in the record to so show. We would think that defendants had a right to examine as to any matter material to their liability, as well as its extent. Neither can we assume that the information sought had previously been given by these witnesses. None of the questions were objected to on the ground that they were repetitious and, furthermore, as stated, defendants offered the entire transcript, which was denied admission on account of plaintiff's objection.

There is little, if any, dispute in the authorities as to either the purpose of this requirement or the result which must follow from failure of the insured to comply. As was said in Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 95, 3 S.Ct. 507, 515, 28 L.Ed. 76: "And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured." Other cases which have held compliance with this provision essential to recovery are Gross v. St. Paul F. & M. Ins. Co., C.

C.Minn., 22 F. 74; Fleisch v. Insurance Co. of North America, 58 Mo.App. 596, 604; Sims v. Union Assurance Society, C. C.Ga. 129 F. 804. Plaintiff cites two cases in support of its refusal to answer questions. Insurance Companies v. Weides, 14 Wall. 375, 20 L.Ed. 894, and Weininger v. Metropolitan Fire Ins. Co., 359 Ill. 584, 195 N.E. 420, 422, 98 A.L.R. 169. In both of these cases, however, the court held that the unanswered questions were immaterial to the issues involved. There is a statement in the Weininger case, stressed by plaintiff, as follows: "The complainants apparently were thoroughly examined upon all of the material issues. The record of such examination covers approximately 300 pages in the record and was conducted by the defendants' adjusters and an attorney. Refusal to answer the questions did not, under the terms of the policy, work a forfeiture."

 We do not see how this statement is of any benefit to plaintiff. Apparently the court had before it all the transcript, while in the instant case we only have a portion, although, as stated, it was all offered by defendants and denied admission on plaintiff's objection. Furthermore, as already suggested, the questions here were not objected to because they were immaterial or had already been answered. Certainly they were material, and in the condition of this record it cannot be presumed that they were repetitious. Any presumption in this respect is to the contrary.

 We have already expressed the view that the circumstances surrounding the presentation of plaintiff's claim for loss were such as to indicate fraud. In such a situation, defendants were entitled to conduct a searching examination, especially of plaintiff's adjuster Glancy, who had prepared and submitted exhibits 15 and 18. Regardless of any consequences to him, they were entitled to the fullest information concerning the preparation of those exhibits, as well as their contents. The refusal to give such information in response to the interrogatories, whether under the advice of counsel or not, was, in our judgment, a non-compliance with the provision. Furthermore, it was such as to work a forfeiture and preclude recovery unless the failure to comply was waived by defendants.

 There is no room for doubt but that there was a complete failure to com-

ply with the provisions as to separation and exhibition of the property. In fact, without dispute, plaintiff on the next day after the fire made itself powerless to comply with these provisions by the sale and removal of at least 5,796 cases of undamaged beer which were salvaged from the fire. Except for the investigation conducted by defendants, this act on plaintiff's part might never have become known. Also by reason of this act, the correct number of cases removed was never capable of ascertainment. The number above stated is that which plaintiff finally conceded as being the number removed and sold. Moreover, so far as we can ascertain from the record, there never was any effort on the part of plaintiff to separate what remained of the damaged and undamaged property even after these 5,796 cases of beer had been removed and sold. Plaintiff calls our attention to certain photographs which were introduced in evidence in support of its theory that such separation was impossible. We have examined these photographs and think they prove nothing in this respect.

A failure to comply with these provisions has also been held to work a forfeiture. Oshkosh Match Works v. Manchester Fire Assurance Co., 92 Wis. 510, 66 N.W. 525; Thornton v. Security Insurance Co., C.C. Pa., 117 F. 773; Siegel v. Ohio Millers Mutual Fire Ins. Co., 8 Cir., 29 F.2d 988. In the Oshkosh case, the facts are quite similar to those of the instant case. There, the court held that the insured had violated the provisions of the policy and could not recover where 908 out of a total of 1,247 cases of matches had been sold and shipped out of the state without the knowledge or consent of the insurer and before an opportunity for inspection. After discussing the provisions of the policy and especially those which required the insured to separate the damaged and undamaged property and to exhibit what remained of the property, the court stated (66 N.W. 527): "The plaintiff thus disabled itself from performing the plain requirements of the policy before the arrival of the adjuster, and had effectually put it out of the power of the company to take these cases, as it had a right to do, at their appraised value. * * * The conditions referred to are substantial and important, and are designed, among other things, to enable the company to fairly investigate and ascertain the loss, and to detect dis-

honesty and fraudulent practices. They were conditions for the protection of the company, to be performed after the loss, and until performed, or performance had been duly waived, no recovery could be had on the policy."

Neither does plaintiff make any contention that a "complete inventory" was furnished as required. Again it claims that compliance in this respect was impossible. In support of this position, plaintiff cites the testimony of one of defendants' adjusters who admitted that at the time he first examined the premises it was not possible to furnish such an inventory. Even if such be the fact, however, the record furnishes no reason why plaintiff could not later have complied with the provision in this respect. Plaintiff finds itself in a rather difficult situation concerning the furnishing of an inventory. As heretofore shown, the contention has been urgently pressed that defendants' exhibit 15 was not an inventory in any sense of the term and that it was never intended as such. Plaintiff's contention, if accepted, places it in a position of making no effort to comply with the inventory requirement. However, we have held that exhibit 15 should be treated as an inventory, although it must also be held that it was not the complete inventory which the policy required.

We are, therefore, forced to the conclusion that there is no factual support for the court's finding that plaintiff complied with all the terms and conditions of the policy prior to the institution of suit. We also hold that the finding that defendants' officers and agents answered all material questions submitted at an oral examination is without support. Furthermore, we think there is no substantial support for the finding that it was not physically possible for plaintiff to furnish a complete inventory.

Plaintiff in its brief makes little effort to sustain these findings. It places its reliance almost wholly upon the premise that defendants by their acts and conduct have waived the right to insist on compliance as a defense and that they are estopped from so doing. Defendants, in reply to plaintiff's assertion of waiver, rely upon three propositions: (1) no question of waiver or estoppel properly arises upon the record; (2) it cannot be raised under the express provisions of the policy; and (3) it cannot be sustained under the

evidence in the case. It is true that plaintiff in its complaint did not allege any waivers or estoppels of any kind. In fact, it alleged complete compliance with the terms and conditions of the policy. However, counsel for the respective parties made opening statements in the court below, as disclosed by the record. In plaintiff's statement, it was stated that plaintiff would show waiver by defendants of any provisions not complied with. Apparently the issue was not regarded as of much importance in the court below; however, the court, as well as counsel for defendants, was advised in plaintiff's opening statement that it was or might be an issue. Defendants rely upon a number of Illinois cases which appear to sustain their contention that waiver must be pleaded. This, however, is a matter of procedure and practice and we are of the view that such authorities are not controlling. The rule in the federal courts appears to be that any issue which was considered by the court below may be ruled upon even though not included in the pleadings. Pennsylvania Casualty Co. v. Miller, 7 Cir., 145 F.2d 292; Fifth Avenue Bank of New York v. Hammond Realty Co., 7 Cir., 130 F.2d 993, 995. We, therefore, conclude that the issue of waiver may properly be considered.

█ The policy is of the standard form prescribed by Sec. 397 of the Illinois Insurance Code, Ill.Rev.Stat.1943, c. 73, § 1009. In conformity with such Code, it contains what we shall briefly refer to as the "waiver" clause, which provides in substance that no provision or condition of the policy can be waived unless such waiver shall be reduced to writing and added to the policy. Defendants contend that plaintiff by reason of this provision should not be permitted to rely upon parole waiver in order to escape forfeiture for non-compliance with the policy provisions. Defendants cite a large number of authorities from jurisdictions other than Illinois in support of their contention that the provisions of a policy may be waived only to the extent and manner provided in the policy. An examination of the authorities relied upon does not, so we think, sustain such contention. The cases so cited in the main deal with provisions in a policy which are sometimes referred to as conditions precedent and which go to the validity of the policy. In fact, in none of the cases cited did the court decide that

provisions for the benefit of the insurer, to be complied with by the insured after loss, could not be waived.

On the other hand, the rule in Illinois appears to be that such provisions may be waived. In Matthews v. Capital Fire Ins. Co., 115 Wis. 272, 91 N.W. 675, the court, in discussing the term "waiver" as contained in a standard form of fire insurance policy, stated (115 Wis. page 275, 91 N.W. 676): "That refers to conditions or provisions requisite to the validity of the contract itself, not to the mere establishment of liability under the contract." The Appellate Court of Indiana, in Travelers Ins. Co. v. Eviston, 110 Ind.App. 143, 37 N.E.2d 310, in construing an Illinois insurance contract concluded (37 N.E.2d page 315): "In other words, a nonwaiver clause may itself be waived." In the rather recent case of Reinhardt v. Security Ins. Co., 312 Ill.App. 1, 38 N.E.2d 310, the court held that a non-waiver provision similar to the one in the instant case could be waived, and on page 12 of 312 Ill.App., page 315 of 38 N.E.2d, stated: "Although there are decisions to the contrary from other jurisdictions, the law is well settled in Illinois that even though such a policy contains a stipulation that a waiver of a right of the company to cancel must be by endorsement on the policy, this stipulation can be waived by such company without a written endorsement * * *; that neither an express agreement to waive the condition nor an express consideration for the waiver is required * * *." We therefore reject defendants' contention in this respect.

█ This brings us to the all-important question as to whether plaintiff's non-compliance in the manner heretofore found was waived by defendants. As already stated, the court below made no finding upon the issue of waiver. It did make what may be termed a contingent conclusion of law. That is, it concluded in effect that if there had been non-compliance by plaintiff, such non-compliance had been waived by defendants. We think the question of waiver is one of fact, to be treated and determined as such. Furthermore, the court made no evidentiary findings from which waiver could be found either as an ultimate fact or from which it could be concluded as a matter of law. Plaintiff in its brief states alleged facts which it contends constitute waiver, with only one record citation. Certainly there is no proof

on the page cited which supports waiver. We are of the view that this important issue should first be considered and determined by the District Court, and that evidentiary findings should be made upon which its ultimate finding or conclusion of law is predicated. In making such determination, the court is not confined to the present record but may consider additional proof material to this issue. Nothing we have said is intended to indicate what we think the determination of the District Court should be upon such issue.

The judgment included the following: (1) an item of $66,590.90, representing the amount of loss sustained by plaintiff; (2) an item of $3,170.28 for unearned premium on the policy in suit; (3) an item of $438.94, representing dividends on such unearned premium; and (4) an item of $5,689.30, as interest at the rate of 5% per annum from February 2, 1942 to the date of the entry of judgment on the total amount of plaintiff's recoverable loss and unearned premium. The validity of items (1) and (4) are or will be dependent upon the lower court's determination of the issue of waiver. Items (2) and (3) are not dependent upon such issue. In other words, these items stand upon their own, and plaintiff's right to recover such items is not dependent upon its establishment of defendants' waiver of non-compliance.

The only finding of the court which in any way has any bearing upon items (2) and (3) is the following: "On or about December 10, 1941, defendants notified plaintiff in writing that they, the defendants, had been advised that the policy in suit was void; whereupon the plaintiff, relying upon the information so furnished by the defendants, obtained other insurance to replace that provided by the policy in suit."

The court's finding in this respect is based solely upon defendants' letter of December 10, 1941, which stated that by reason of plaintiff's concealment, misrepresentation, fraud and false swearing, defendants had been advised that the policy "is void"; and on a telegram of December 11, 1941, in which defendants stated: "We consider your policy void for the reasons stated in our letter."

Admittedly, there is no proof that plaintiff "obtained other insurance to replace that covered by the policy in suit," although it is argued by plaintiff, and perhaps correctly, that this is immaterial.

While the court concluded as a matter of law that plaintiff was entitled to recover the unearned premium, we are not advised as to the theory upon which such recovery was permitted. We assume from the court's finding of fact, however, that it was because the policy had been declared void by the defendants. Plaintiff in its brief argues rather feebly that such was the case, but argues further that in any event defendants' action amounted to a cancellation of the policy. We cannot accept the view that the policy became void. After all, defendants' letter amounted to no more than the expression of an opinion that it had become void by reason of plaintiff's fraud. We assume that if the policy became void by reason of plaintiff's wrongdoing, that is, its fraud, that no one would contend that plaintiff was entitled to recover unearned premium. However, the charge of fraud made by defendants and assigned as the basis for the assertion that the policy had become void was a controverted issue. This issue was decided by the District Court adversely to defendants' contention, which decision we have approved. Therefore, the premise upon which the defendants' assertion rested having been found to be without substance, it would seem that it was without any legal force. Suppose plaintiff had sustained another fire loss subsequent to the one involved in this suit. We doubt if it would be seriously contended that defendants could successfully maintain that the policy was no longer in effect. The most that they could do would be again to plead plaintiff's fraud, which would raise the same issue as that decided adversely to them in this case.

Neither do we think that defendants' letter amounted to a cancellation. The policy contained a provision which expressly authorized a cancellation of the policy by either the insured or the insurer. As to the latter, it stated: "This policy may be cancelled at any time by the company by giving to the insured a five days' written notice of cancellation * * *." When thus cancelled by the insurer, the provision required the refunding upon demand by the insured of the unearned portion of the premium. Certainly there was no cancellation within the terms of this provision. Furthermore, the record furnishes no reason to conclude that plaintiff regarded defendants' action as a cancellation. It made no demand for a refund of

premium and, as already stated, there was no proof that plaintiff obtained or sought to obtain other insurance in lieu of that which it now claims was cancelled. It is, therefore, our view and we so decide that insofar as this record discloses the policy was in effect until October 31, 1943, the date of expiration according to its terms. Accordingly, plaintiff was not entitled to recover the amount awarded as unearned premium.

There is another matter, however, which is relevant to plaintiff's contention respecting this unearned premium, which arises from the fact that the policy carried what is designated as an "Unearned Premium Endorsement." This provision states: "In consideration of $40.08 additional premium this policy covers $4,887.20 on premiums charged for this policy which, by virtue of a loss under this policy, become earned for the unexpired term."

We are not advised either from the findings or conclusions of the court below as to what, if any, effect was given to this provision. Plaintiff attempts to utilize it to bolster its claim for unearned premiums because of cancellation. We think this is a misconception of the purpose of this additional protection. This is so for the reason that under the cancellation clause, as already pointed out, plaintiff was entitled to a refund of all unearned premium upon cancellation. This additional clause, in our view, furnished added protection only in the event that the policy continued in force. Furthermore, it was without effect except "by virtue of a loss under this policy." Plaintiff's loss, as found by the court, was $66,590.90. The amount of its coverage ($298,000) was therefore reduced to that extent, or, in other words, the coverage after July 17, 1941 (the date of the loss) was $231,409.10. After the loss, if plaintiff desired the same coverage as it had prior to the loss, it would be necessary for it to procure additional insurance to the extent that its coverage had been reduced by its loss. The purpose of this endorsement and this additional premium was, in our view, to protect plaintiff against such contingency. Plaintiff under this provision is entitled to recover the amount of the premium which was paid for this $66,590.90 from the date of loss to the expiration of the policy, and this is so irrespective of how the court below decides the issue of waiver.

Under this view, as we calculate, plaintiff should recover about $850. (We leave the determination of the exact amount to the District Court.)

The item of the judgment for dividends is predicated upon the following provision in the policy: "The policy holder named herein shall be entitled to such dividends as may be declared by the Boards of Directors of the companies subscribing hereto." Here again the court made no finding of fact as to dividends, but stated as a conclusion of law that plaintiff was entitled to recover $438.94 as dividends on the amount of the unearned premium for the policy. The only proof offered by plaintiff in support of this recovery consists of certificates issued by defendants respectively relating to dividends declared by them on earned premiums. All of such certificates stated that no dividends had been declared on policies which would expire, terminate or be cancelled subsequent to February 28, 1943. Inasmuch as the instant policy did not expire until October 31, 1943, it is obvious that these certificates furnish no evidence in support of a judgment for dividends. We assume, although there is nothing in the record to show, that the court below allowed recovery of this item on the theory that the policy was cancelled by defendants' action. We have, however, already discussed and decided this contention adversely to plaintiff. It was not entitled to a judgment for dividends.

Defendants contend that inasmuch as the amount of the loss was in dispute and uncertain, plaintiff was not entitled to interest prior to the entry of judgment. In view of the disposition which we are making of this appeal, it is perhaps unnecessary to decide this issue; however, we take the liberty of expressing the view that defendants' contention in this respect cannot be sustained. The rule as to when interest commences to run, under circumstances quite similar to the instant case, is stated in Jay-Bee Realty Corp. v. Agricultural Insurance Co., 320 Ill.App. 310, 330, 50 N.E.2d 973. In that case numerous other Illinois cases are referred to and discussed, which obviates any necessity for their discussion on our part. We accept the holding of the Appellate Court in that case as the law in Illinois.

In conformity with what we have said, the judgment in its entirety is reversed and

remanded for further proceedings consistent with the views herein expressed.

EVANS, Circuit Judge (dissenting in part).

I believe the District Court properly included in the judgment the sum of $3,170.28, which is the amount of the unearned premium. Therefore I am unable to agree with the majority opinion in respect to this item.

The complaint states, and the court found, that on December 11, 1941, the defendants advised plaintiff that the policy was void because of concealment and misrepresentation of material facts and by reason of fraud and false swearing by the insured. The complaint also charged that as a result of this statement by the defendants, plaintiff took out new insurance. The court found that plaintiff, relying upon this notice to be true, obtained other insurance. The above letter notifying plaintiff that its policy was void, was followed by a telegram to plaintiff as follows:

"In Answer To Your Telegram This Date We Consider Your Policy Void For The Reasons Stated In Our Letter."

In one count of its complaint, plaintiff sought to recover the unearned premium for the period from December 11, 1941 to October 31, 1943. This amount was $3170.28. Defendants admitted in their answer that on the 11th day of December, 1941, they informed the plaintiff that the said policy of insurance was null and void.

We are not here considering the cancellation clause of the policy, but the following clause: "This entire policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

It was the clause just quoted which the defendants invoked when they declared the policy void. There was another, a cancellation clause, which is referred to in the majority opinion, but it is of importance only as it influences the construction of the above-quoted provision. Turning to the above provision we find it is somewhat of a catch-all clause, the object of which is to justify a voiding of the policy and the avoidance of a return of the unearned premium, which would result from a cancellation of the policy.

As applied to the instant case, it should be stated that there was no claim of fraud or misrepresentation except in reference to the amount of plaintiff's loss. Admittedly there was no misrepresentation of any material fact in securing the insurance policy, nor in the loss itself. It is therefore only in reference to the alleged fraud or false swearing by the insured in reference to the proof or claim of loss that this provision may be invoked.

The majority opinion sustains the District Court's finding that there was no fraud on the part of the insured in its proof of loss. Defendants' statement to the insured that the policy was void, was therefore unsupported by the facts. Defendants were obligated to return the unearned premium to plaintiff. Had they invoked the provision for cancellation and given five days' notice, they would have been required, as the policy expressly provides, to pay the "excess of paid premium above the pro rata premium for the expired time." Their obligation was not lessened by virtue of their invoking a clause respecting the voiding of the policy, where in fact there was no ground therefor. 29 Amer.Juris. p. 286.

I do not find support for any different conclusion because plaintiff paid an extra $40.08 premium. The policy provision is, "In consideration of $40.08 additional premium this policy covers $4,887.20 on premiums charged for this policy (but not this Endorsement) which, by virtue of a loss under this policy, became earned for the unexpired term."

If capable of any intelligent meaning, I do not look upon it as in anyway affecting plaintiff's right to recover the unearned premium, which arose when defendants unlawfully voided their contract.

Regardless of the ultimate outcome of the issue upon which the majority opinion remands the case for further findings, plaintiff is entitled to recover this item with interest.

Inasmuch as the cause is to be returned to the District Court for evidence and additional findings on the issue of waiver (see the majority opinion), I think the court might also hear counsel, and if necessary, additional evidence on the question, Did plaintiff take out other insurance after

defendants notified it that their policies were void?

The District Court found, as a finding of fact, that plaintiff did take out such insurance. In the majority opinion it is stated that this finding is unsupported by the evidence. This issue should not be left in doubt. Plaintiff's taking out new insurance and the paying of premiums therefor should be clearly established or disproved when the case is returned to the District Court.